LAMPKIN v. HEARD.*

(Division B.   Jan. 26, 1925.)

[102 So. 565.   No. 24561.]

1. CONTRACTS.   *Meaning of contract to be determined from contract as whole.*

   In construing particular provisions of the contract, the contract as a whole will be looked to and its meaning determined from the entire contract.

2. APPEAL AND ERROR.   *Judgment of trial court based on conflicting evidence upheld, if evidence is sufficient to support it.*

   Where an option was given to a person to be exercised within the fixed period of time with a right of extension of the time, on making or discovering certain facts provided for extending the option, and where there is a conflict in the evidence as to whether such facts exist, and the chancellor finds for one of the parties, the judgment of the chancellor will be upheld, where the evidence is sufficient to support it.

---

*Headnotes 1. Contracts, 13 C. J., section 486; 2. Appeal & Error, 4 C. J., section 2870.

APPEAL from chancery court of Lowndes county.

HON. T. P. GUYTON, Chancellor.

Suit by C. B. Lampkin against G. T. Heard.   From judgment for defendant, complainant appeals.   Affirmed.

*John F. Frierson,* for appellant.

The primary purpose of the contract was declared to be finding oil and gas. But there were other distinct purposes set out in the contract all the way through, and the profits were to be divided equally. It was provided in the contract as follows: First: That the lands mentioned therein should be valued at twenty-five dollars per acre for the lands across the creek from the city of Columbus, and seventy-five dollars per acre for the lands on the same side of the creek of the city of Columbus. Second: That the appellant as second party to the contract, should have an additional six months to the option in case there was evidence sufficient to justify the parties to believe that there was oil or gas on the land. Third: That if the parties decided to exploit the land for oil or gas they would determine whether to sell the lands or to develop the oil and gas themselves and in case they determine to sell that the price, as above stated, be deducted from any sale price and the amount over and above should be considered profit, to be divided equally. Fourth: In case they determined not to sell, but to develop the industry that additional arrangement should be made between them as to financing such project. Fifth: That the first party, the appellee, would finance the purchase of the other properties that both of said parties should agree as needed or wanted by them for the production of oil or gas or both. Sixth: That any lands which had been spoken of by the second party as desirable, in case same were rejected by the first party, then the same might be used otherwise by the second party and the first party would hold in strict confidence any information which had been conveyed by the second party. Seventh: That the first party, at the time of the contract, owned an option on certain lands known as the J. W. McKissick lands and he assigned to the second party by the contract an undivided one-half interest in and to such

option. The principal matters in this contract upon which the suit is based are the paragraphs numbered five and seven.

Aside from the fact as to whether oil and gas were present, it is evident that the appellee, as well as appellant considered the scheme of acquiring additional property an advisable one, and was urging, from time to time, the appellant to secure the McKissick tract and the Puckett tract and other lands of which specific mention is made in the evidence. The tracts of McKissick and Puckett were the only tracts actually acquired. They were acquired under the terms and conditions of the contract. Large benefits were derived from the sale of these lands.

The only question to be decided by the court is whether under the facts and the evidence the appellant is entitled to receive his proportionate share in the lands (McKissick and Puckett tracts) or in the profits that have been derived from them. Appellee is a great letter writer and much of his correspondence with appellant was introduced into evidence. A number of these letters had been filed as exhibits to the bill. Most of this correspondence by both parties was in longhand and few or no copies were kept, but a number of the letters of appellant were produced and filed as exhibits to the cross-examination.

The appellee denied in his oral testimony, first, that any previous discussion of the contract prior to the date of it had been held, and, second, alleged in his answer and in his evidence that the McKissick tract was not purchased under the option in which an interest had been conveyed to appellant, that the option mentioned in the contract, Exhibit "A" had expired before the McKissick tract had been purchased. We think that these letters fully disclose that appellee and appellant were working together and for the benefit of both parties and further that the profits thereto were to be divided fifty-fifty.

Appellant testified that after entering into the contract with Mr. Heard with reference to securing and acquiring lands, "acting under the contract, we got the McKissick property and the Puckett property." Appellant's testimony further shows that there were many telephone conversations and many visits between the parties and that when the matter of the sale of the land to Elliott came up it was within the life of the contract and Mr. Heard recognized appellant's right and portion of the property. The testimony of the appellant is direct, straight forward and the principal reliance is placed upon the letters introduced into evidence which speak for themselves. The testimony of the appellee is vague and he introduced only two letters of appellant. He made a general denial of any obligation to the appellant and claims that he had employed C. B. Lampkin at a salary of five dollars per day. This testimony is directly contradictory of the contract which the parties entered into. Testimony that Lampkin or he did not want any land but only an interest in the oil rights is directly contradictory of the contract because the contract looked to the purchase of additional lands and stated that the above price which might be paid for additional lands was to be divided equally between the parties.

The prayer of the bill is not for one-half interest in the entire value or for a one-half interest in the profits on the sale to Elliott but simply for a one-half interest in the profits on the McKissick tract and the Puckett tract. This prayer should have been allowed and the court should reverse this case and grant a decree herein in accordance with the prayer quoted. The appellant has an equitable interest in the property for his one-half interest in the lands less the purchase price thereof and for one-half interest in any and all profits which have accrued by reason of payments which had been made by Elliott during the time he owned the land.

*Baskin & Wilbourn,* for appellee.

The case was heard in the court below on bill and answer and proof. There were only two witnesses, the complainant and the defendant. Both testified orally before the chancellor in open court. The chancellor saw and heard both, and resolved the conflicts in their testimony and the issues between them in favor of appellee, after overruling practically all of the many objections of appellee to appellant's testimony. This court, we submit, may not disturb the chancellor's findings of fact in favor of appellee unless they are clearly not manifestly wrong. We submit that the decision of the chancellor was manifestly right.

Appellant was and is a surveyor or civil engineer by profession, and seemed to have been obsessed with the idea that oil could be found in that vicinity. Appellant owned no lands near Columbus and had no interest in any of the above-mentioned lands. Full of the notion that there was oil in the vicinity of Columbus, and that some character of test that he claimed had been given him by the Government authorities indicated the presence of oil, appellant negotiated with appellee for the contract, Exhibit "A", sued upon, dated August 6, 1919. Appellant made exhibits of his bill and offered several letters antedating the date of the contract, all of which were objected to, and none of which, as we submit, should have been admitted in evidence. They were admitted by the court, however, and we, also, say that they proved nothing to the advantage of appellant.

Appellee, in his testimony, explains that before any negotiations were taken up with him by Lampkin, and in the early part of the year 1919, he found he had been in possession of part of McKissick land by mistake for several years and it had been sold for taxes, but time for redemption had not expired, and he employed Lampkin and paid him to look it up for him. None of the letters show or recognize a completed contract between the par-

ties of themselves, and it is clear that none of them show any consummated agreement to buy the McKissick lands, or any lands for the joint account of the parties, nor any payment for any lands by Lampkin, nor any purchase of said or any lands by the parties. They relate to negotiations between the parties for a contract finally resulting in the one of August 6, 1919, sued on, and which negotiations were merged in or done away by the contract of August 6, 1919. They are no part of the contract, Exhibit "A", and are not admissible and should have been excluded. *A. & V. R. R. Co.* v. *Kropp,* 92 So. 691.

No decree in favor of appellant could be based on said letters, nor can the court now disturb, we submit, the finding of the chancellor on the evidence of Mr. Heard relating thereto. The contract, Exhibit "A", to the bill, speaks the sole agreement of the parties as to their contract.

Construing this contract, we submit the following observations: (a) It is an option merely on certain lands of Heard, for a limited time, which expired, without being exercised. In his first suit, appellant claimed right of recovery on the lands Heard owned and attempted to be described in the option; but he abandoned that contention, and now does not ask aught on that score. (b) But the option was void anyway, as to Heard's lands, for uncertainty of description thereof: *Phelps* v. *Dana,* 83 So. 745; *Fowler* v. *Nunnery,* 89 So. 156; *Queen City Hoop Co.* v. *Barrett,* 89 So. 819; *Bomer Bros.* v. *Canady,* 79 Miss. 222, 30 So. 638; *Cole* v. *Cole,* 54 So. 853; *Fisher* v. *Kuhn,* 54 Miss. 480; *Nickerson* v. *Fithian Land Co.,* 118 Miss. 722. (c) The option was conditioned wholly upon the finding of oil. But no oil was found, either in the life of the option or since. (d) Whether or not appellant was entitled to and received or allowed an extension of the option for six months, is largely immaterial. The condition of the additional six months was either finding of oil or finding evidence of oil or gas, sufficient "to justify the said parties hereto to believe

there is oil or gas on said land." No such condition arose. Heard denied that any evidence of oil was shown him to justify such belief. The six months additional time was simply given to verify the presence of oil or gas." Appellant, Lampkin, never proved that he ever showed the evidence or signs of oil or gas to Heard. At any rate the chancellor resolved, whatever of conflict Lampkin's testimony may have raised, in favor of Heard. There was no right to any extension of the option. Having expressly, in the third paragraph of the contract, stipulated, as follows, to-wit: "Provided the said party of the second part shall find oil or gas on the land during the said six months, otherwise this contract shall not operate to give to the said second party any option on the said land at all," thereby making the contract conditioned upon the finding of oil or gas, the parties still, with that in mind, added the fifth paragraph, which dealt with the contingency of their wanting to develop the gas or oil in the event it was found "in sufficient quantities for development." In that event, assuming, of course, that the option had been exercised, and that oil or gas had been found, the parties were then to decide whether or not they would sell the land, or develop the oil or gas found upon the land.

The sixth paragraph of the contract, deals with the contingency, in the event oil or gas was found, the option exercised, and it was decided to hold the land and develop the gas and oil industry. In that event, the parties merely agreed to make additional arrangements touching the financing of the said project. But no contingency arose bringing into play that paragraph of the contract.

In the seventh paragraph, the one upon which counsel seems principally to base his contention, and which he has underscored in his brief, it is stipulated, as follows: "It is further agreed and understood between the parties that the said first party will finance the purchase of all other properties that both of said parties shall agree

137 Miss.—34.

as needed or wanted by them for the production of oil or gas or both." Whatever be the force or effect of this provision, or the meaning of it, the parties were in sharp conflict in their testimony as to whether or not the Mc-Kissick and Puckett lands in controversy, were bought pursuant to this paragraph. The answer denies, and the testimony of Heard denies that these lands were agreed to be "needed and wanted by the parties for the production of oil or gas or both." And both the pleadings and testimony of the appellee dispute the contention that either the Puckett or McKissick lands were the lands that the parties agreed were lands needed or wanted by them for the production of oil or gas or both. On the conflict of testimony as to this, the chancellor decided in favor of the appellee, and it seems to us that that ought to be sufficient to dispose of this appeal. Unless oil or gas was found, the parties would never be in a position to decide whether or not they would "want or need the lands for the production of oil or gas or both." But the clause cannot avail the appellant anything, for the additional reason that in this suit he is claiming the right to one-half of a supposed profit that Heard is supposed and alleged to have made when he re-sold the McKissick and Puckett lands, bought by him, with his own money, and in his own name, which lands he lumped in with a trade of lands that he owned originally and on which all of the valuable improvements were located and which was a valuable and attractive tract of land. At least that was the idea of the original bill, but pending the suit, the purchaser of Heard fell down on his trade, and Heard had to foreclose and did foreclose his deed of trust and re-acquired all of the property; and by amendment, it was sought to assert, under this clause in the contract, a right in the appellant to one-half interest in the lands known as the McKissick and Puckett lands, on the theory that this clause in the contract was an agreement that the lands should be purchased for the joint account of the

parties, and that one-half of it would belong to Heard and one-half of it would belong to Lampkin.

No such idea is warranted. First, because the chancellor has decided on the conflicting testimony that the lands were not purchased under the clause, nor because of it, nor for the joint account of the parties; second, because the clause never came into play, owing to the fact that neither oil or gas was ever discovered, and the parties were never, at any time, in an attitude where they were considering even the matter of going into the business of producing oil or gas from any lands; and, third, because the clause is entirely too indefinite and uncertain, and incomplete and insufficient to base any such contention as the appellant now makes upon it.

The correspondence that is in the record clearly indicates that Heard and Lampkin were corresponding, without any thought in the mind of either, that Lampkin had any interest in or claim to Heard's lands.

A good deal is said and stress laid upon that clause of the contract, Exhibit "A," whereby Heard conveyed to Lampkin one-half interest in an option that he then had from McKissick. However, that ption was not introduced into the record, and there is no testimony to show that Lampkin ever exercised such option, and the conveyance to him of one-half interest in the option simply meant to convey to him the one-half interest in the right to come forward and pay his part of the purchase price of the land and join in the purchase. It certainly was no agreement on Heard's part to buy the McKissick land for their joint account, with his own funds, and give Lampkin the benefit thereof.

This suit is in the nature of a suit for a specific performance. It is a suit in which the effort is to show, by writings, to-wit, correspondence and contract, Exhibit "A," a contract or agreement binding Heard to put up his money and purchase lands and take the title in his own name, and allow Lampkin to have one-half interest in this land. No such writing is in the record, nor the

correspondence, nor contract, that established such an agreement between the parties. If Heard had lost money in the transaction he would not, under this record, have had the slightest basis for demanding anything from Lampkin.

The contract is not supported by any adequate consideration, and it cannot be enforced in a court of equity. 6 Pomeroy's Equity, secs. 789, 790; *Clement* v. *Reid,* 9 S. and M. 535; *Aston* v. *Robinson,* 49 Miss. 352. The contract is too indefinite and uncertain for enforcement. *Beaver* v. *Crump,* 76 Miss. 34; *Bomer* v. *Canady,* 79 Miss. 222; *Welch* v. *Williams,* 85 Miss. 301.

We submit, in connection with these authorities, also, that the burden of proof was upon Mr. Lampkin, and that the matter of specific performance of contract generally, is always within the discretion of the court. Under the authorities as well as under the whole record, the right result was reached.

Argued orally by *John F. Frierson,* for appellant, and *R. E. Wilbourn,* for appellee.

ETHRIDGE, J., delivered the opinion of the court.

The appellant and appellee entered into the following contract:

"This contract made and entered this 1st day of July, 1919, by and between G. T. Heard of Brooksville, Noxubee county, Miss., party of the first part, and C. B. Lampkin, of Columbus, Lowndes county, Miss., party of the second part, witnesseth:

"That the said party of the first part is the owner in fee simple of the certain tract of land situated in Lowndes county, Miss., and among which is about two hundred seventeen acres of land on the opposite side of Luxapalila creek from the city of Columbus, and about forty-eight acres on the same side of the creek with the said

city of Columbus, and all of said land being in section 14, township 18, range 18 west, Lowndes county, Miss.

"That for the consideration of the sum of one dollar cash in hand paid, the receipt whereof is hereby acknowledged and other good and valuable considerations this day had and received, the said first party does by these presents grant to the said party of the second part an option on the said land for a period of six months from the 1st day of July, 1919, at and for the sum and price of twenty-five dollars per acre for the land on the opposite side of the creek from the said city of Columbus and at the sum and price of seventy-five dollars per acre for the land on the same side of the said creek with the city of Columbus, provided the said party of the second part shall find oil or gas on the land during the said six months, otherwise this contract shall not operate to give to the said second party any option on the said land at all.

"In the event that the said second party shall find oil or gas on the said land or shall find evidence sufficient to justify the said parties.hereto to believe that there is oil or gas on the said land, then the said party of the second part shall have an additional six months time in which to verify such belief or evidence as to the existence of oil or gas.

"It is further agreed that in the event that it should be determined to exploit the said land for gas or oil and in sufficient quantities for development, then the said parties shall determine between themselves whether they will sell the said land or develop the gas or oil so found upon the said land. In the event that it is determined to sell the said land, then the price of twenty-five dollars per acre and seventy-five dollars per acre respectively shall be deducted from any sale price of the said land, and the difference shall be considered profit, and shall be divided equally between the parties hereto.

"In the event the said parties shall determine not to sell the said land but to develop the gas and oil industry

themselves and in order to do so it shall be necessary to procure funds sufficient to finance same, then additional arrangements shall be made between them as to financing the said project.

''It is further agreed and understood between the parties that the said first party shall finance the purchase of all other properties that both of said parties shall agree as needed or wanted by them for the production of oil or gas or both.

''And it is further agreed between the parties that any lands that have been spoken of by said party of the second part to the said party of the first part as desirable or necessary to purchase for the development of oil or gas and said lands are rejected by the said party of the first part, then all of the said spoken of lands can be handled by the second party and the knowledge thus divulged concerning said land by the second party as to such oil or gas signs, or as to their intention to purchase, shall be held in strict confidence by the said party of the first part.

''It is further understood that the first party has at the present time an option to purchase certain lands from one J. W. McKissick and for the above considerations does by these presents assign to the second party an undivided one-half interest in and to such option.

''Witness our signature this 6th day of August, 1919.''

In 1920 an original bill was filed which was dismissed without prejudice, and on the 12th day of September, 1921, the appellant filed the present bill setting up the contract. The complainant also alleged that certain lands were purchased by the defendant, Heard, known as the McKissick land and the Puckett land; that the McKissick land contained sixty-three acres taken in the name of Heard at and for the price of seventeen dollars and fifty cents per acre about December 6, 1919, and that the Puckett land consisted of eighteen acres purchased at a price of eight dollars per acre on November 18, 1919. Complainant also alleges that he is in equity the owner of an

undivided one-half interest in fee simple in said tracts of land, but alleges that Heard on the 1st day of January, 1921, conveyed said lands to J. T. and Irene Elliott at and for the sum of one hundred twenty-five dollars per acre; other lands were conveyed in the deed from Heard to Elliott also. Complainant alleged that he claimed no share of the profits on the other lands, but was entitled to the profits on the McKissick and Puckett lands, making a total profits of $4,163.75, of which he was entitled to one-half. The sale to Elliott was for part cash and part deferred notes. Complainant claimed a proportionate part of the five thousand dollars cash payment and a proportionate part of the notes, etc.

The defendant denied the complainant's right to share in the profits of the said transaction, but claims to have bought the property on his own account; also that he reserves the oil and gas rights in the conveyance of the property to the Elliotts, and that the complainant's rights were dependent upon finding oil and gas upon the lands involved.

There was considerable correspondence introduced in evidence, and both Lampkin and Heard testified orally before the Chancellor. Heard testified that he did not purchase the property under the option which he had from McKissick at the time of the execution of the contract, and also testified that there never was found a sufficient indication of oil to warrant the belief that oil existed in said lands. Heard also testified that he had employed Lampkin to represent him in certain matters referred to in the correspondence and had paid him for that service. He also testified that Lampkin had refused to pay any part of the purchase price of the said lands. Some of the questions and answers in his evidence were as follows:

"Q. Did he ever pay any part of the purchase price of the land? A. No, sir.

"Q. Did he ever say anything about paying up for half of the purchase price of the land? A. Mr. Lampkin refused to pay me money, stating at various times

that he had no interest in land, stating that he had interest in oil rights.

"Q. Did you ask him to pay any interest? A. Yes, sir.

"Q. Then he positively refused to exercise any option on the lands? A. Yes, sir, on any lands.

"Q. Mr. Heard, did you later buy the land from McKissick under the option or not? A. I did not.

"Q. How was that? And how was that that you did not buy it under the option? A. Well, I suppose we did not agree any way, I did not get it under the option, and did not buy it until several months afterwards under a different contract.

"Q. Mr. Heard, did Mr. Lampkin and yourself ever agree that the McKissick land was land that you and he both wanted for the production of oil and gas? A. He did not.

"Q. Did you and Mr. Lampkin buy together the McKissick land? A. We did not."

Lampkin testified to the contrary. Heard also testified that he paid Mr. Puckett eight dollars an acre for the Puckett land; that that was full value for the land and it was not worth any more than that, and that that was more than the value of the land at the time, and that the present value of those lands is now less; that neither of these tracts had improvements on them; and that there were improvements on other parts of the land sold to Elliott.

Taking the contract between the parties as an entirety, we think the rights of Lampkin were limited to the business of dealing in oil and gas lands either for sale or production. In other words, the agreement was intended to cover the business of either developing oil properties or of speculating in them, and, unless there was some evidence within the option period that oil was produced or could be produced or existed in the lands, the rights of the complainant would expire at the end of the option period. There was a dispute between the complain-

ant and the defendant as to whether there were evidences of the existence of oil in the lands. The sale by Heard to Elliott was not made until the extended period or additional six months mentioned in the option had expired.

The chancellor decreed for the defendant, and on the record we are unable to say that he was not correct in so doing.

The judgment will therefore be affirmed.

*Affirmed.*