# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CT-00856-SCT

*FACILITIES, INC.*

*v.*

*ROGERS-USRY CHEVROLET, INC.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 04/04/2003 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GLENN GATES TAYLOR |
| ATTORNEYS FOR APPELLEE: | LEM G. ADAMS, III |
| | CHRISTOPHER PAUL PALMER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED AND REINSTATED, AND THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED - 06/30/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### RANDOLPH, JUSTICE, FOR THE COURT:

### FACTS AND PROCEDURAL HISTORY

¶1.     In this dispute over a commercial lease, the facts and procedural history are taken from

the record with excerpts from the opinion of the Court of Appeals:

> Rogers-Usry Chevrolet ["Rogers-Usry" or "Lessee"] is a car dealership

operating in Brandon, Mississippi.[1]   In 1985, Rogers-Usry leased [property] from Facilities, Inc. ["Facilities" or "Lessor".]   The [property] was to [be used as a retail] car dealership.  The lease was for a term of fifteen years, and in 1998 Rogers-Usry and Facilities renewed the lease until April 30, 2015.  The lease provided that in addition to a base amount of rent, which would increase annually [after the first ten (10) years] according to the Consumer Price Index, Rogers-Usry would pay Facilities bonus rent [for] new vehicle sales exceed[ing] one hundred vehicles per month.[2]

* * *

In 2000, Rogers-Usry [obtained] a tract of land a few hundred feet from [the leased property]. . . .[3]  Rogers-Usry . . . moved its new car sales to the new location.   Although Rogers-Usry continues to [lease] the Facilities property, Rogers-Usry . . . argues that it is under no obligation to continue paying Facilities bonus rent for new vehicle sales which [do not] occur on the [property subject to the Lease Agreement].

---

[1] The dealership was originally Rogers-Dingus Chevrolet.  The dealership was later changed to Rogers-Usry Chevrolet.  Although the dealership is presently operating as Rogers-Dabbs Chevrolet/Hummer, it was Rogers-Usry at the time the litigation was initiated.

[2] Ultimately concluding that the Lease Agreement was _not_ ambiguous, the Court of Appeals stated: "Facilities argues that this bonus rent provision was included in the lease to compensate for Facilities' acceptance of a rent that was below market value.  Thus, Facilities would profit as Rogers-Usry grew and profited.  Furthermore, the lower base rent would allow Rogers-Usry flexibility as it struggled to establish its self as a business." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, ___ So. 2d ___, 2004 WL 2221733 at ¶1 (Miss. Ct. App. Oct. 5, 2004).   As will be discussed *infra*, III, the Court of Appeals relied upon evidence not within the "four corners" of the contract.  Extrinsic evidence should not be considered absent a finding that the contract is ambiguous.  The Court of Appeals erred in considering extrinsic evidence to determine the intent of the parties in light of its determination that the contract was not ambiguous.

[3] The Court of Appeals also stated: "There has been much debate between the parties as to whether the expansion onto the new land was to allow Rogers-Usry to comply with a General Motors initiative which required its dealerships to conduct new vehicle sales from modern dealerships which functionally and aesthetically comply with national General Motors standards." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*,___ So. 2d ___, 2004 WL 2221733 at ¶2 (Miss. Ct. App. Oct. 5, 2004).  Again, this was error. *See supra*, n. 2, and *infra*, III.

Rogers-Usry filed an action in 2002 seeking a declaratory judgment on its rent obligations to Facilities under the renewed lease. Rogers-Usry argue[s] that when it moved its new vehicle sales to the new property, it [was] no longer . . . obligated to pay Facilities [new vehicle sales] bonus rent. Facilities argue[s] that the lease provided in unambiguous terms that Rogers-Usry owed Facilities bonus rent on new vehicle sales whether the sale occurred on the dealership's new property or the sale occurred on the land leased from Facilities. . . . The chancellor ruled that, under the contract, Rogers-Usry was not obligated to pay Facilities bonus rent for new vehicle sales that did not occur on the property owned by Facilities.

It is from [that] judgment that Facilities [. . .] timely filed its appeal, arguing the following three points of error: (1) the lease is clear and unambiguous in its terms; (2) the chancellor erred in his interpretation of the bonus rent provision of the lease; and (3) the chancellor's interpretation of the lease deprives Facilities of a substantial benefit of the bargain it made in 1985 and renewed in 1998.

*Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, ___ So. 2d ___, 2004 WL 2221733 at ¶¶1-4 (Miss. Ct. App. Oct. 5, 2004).

¶2.     The Court of Appeals agreed with the chancellor that the lease contract was not ambiguous as a matter of law. However, it reversed and remanded the case to the Rankin County Chancery Court.[4]  *Id.* at ¶¶5, 10-11. Specifically, the Court of Appeals, viewing the language within the "four corners" of the contract, found that the contract was not ambiguous, and therefore, that the chancellor "erred in concluding that the parties intended for the bonus rent to apply only to new vehicles sold on the property rented by Facilities. *Id.* at ¶10.

¶3.     Rogers-Usry filed a petition for a writ of certiorari, asserting error in the Court of Appeals' reversal and remand of the trial court's judgment, and we granted certiorari. Rogers-Usry raises as issues the following, which have been restated for clarity:

---

[4] Because the Court of Appeals concluded that this issue was dispositive of the appeal, it did not address the other issues raised on appeal.

1.    Whether the decision that was rendered by the Court of Appeals conflicts with prior decisions rendered by this Court.

2.    Whether the present case involves fundamental issues of public importance requiring determination by this Court.

¶4.    Following a review of the Lease Agreement/contract as a whole, we conclude that the lease is not ambiguous.    The Court of Appeals erred when it considered extrinsic or parol evidence, not found within the "four corners" of the Lease Agreement, after it concluded that the agreement was not ambiguous.    Consequently, we are obliged to reverse the judgment of the Court of Appeals and affirm and reinstate the judgment of the Rankin County Chancery Court.    As the first issue is dispositive of this appeal, the second issue will not be addressed.

**DISCUSSION**

¶5.    "'Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder.'"    ***Parkerson v. Smith***, 817 So. 2d 529, 532 (Miss. 2002) (quoting ***Miss. State Highway Comm'n v. Patterson Enters., Ltd.***, 627 So. 2d 261, 263 (Miss. 1993)).    We, as an appellate court, employ the de novo standard of review for questions of law.    ***Starcher v. Byrne***, 687 So. 2d 737, 739 (Miss. 1997).

¶6.    "The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties."    ***Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.***, 857 So. 2d 748, 752 (Miss. 2003) (citing ***Kight v. Sheppard Bldg. Supply, Inc.***, 537 So. 2d 1355, 1358 (Miss. 1989)).    "'In contract construction [cases, this Court's] focus is upon the objective fact--the language of the contract.    We are concerned with what the contracting parties have said to each other, not some secret thought of one not

4

communicated to the other.'" *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001) (quoting

*Osborne v. Bullins*, 549 So. 2d 1337, 1339 (Miss. 1989)).

¶7.     This Court has stated:

> ¶ 10. This Court has set out a three-tiered approach to contract interpretation. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-53 (Miss. 1990). Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. [*Cooper v. Crabb*, 587 So. 2d 236, 241 (Miss. 1991). . . .] First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. *Pursue Energy Corp.*, 558 So. 2d at 352 (citing *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975)). We must look to the "four corners" of the contract whenever possible to determine how to interpret it. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). When construing a contract, we will read the contract as a <u>whole</u>, so as to give effect to all of its clauses. *Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 126 (Miss. 1992). Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42-43 (Miss. 1992). Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. *Id.* (citing *Cooper*, 587 So. 2d at 241). On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." *Pursue Energy Corp.*, 558 So. 2d at 352. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. *Id.* "[T]he mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Turner*, 799 So. 2d at 32; *Cherry v. Anthony*, 501 So. 2d 416, 419 (Miss. 1987).
>
> ¶ 11. Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary "canons" of contract construction. *Pursue Energy Corp.*, 558 So. 2d at 352. Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party. *Leach v. Tingle*, 586 So. 2d 799, 801-02 (Miss. 1991) (citing *Stampley v. Gilbert*, 332 So. 2d 61, 63 (Miss. 1976)). Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. [*Pursue Energy Corp.*, 558 So. 2d at 353]. It is only when the review of a contract reaches this point that prior negotiation, agreements and

conversations might be considered in determining the parties' intentions in the construction of the contract.

*Royer*, 857 So. 2d at 752-53 (emphasis added).

### I. The Lease Agreement is Not Ambiguous.

¶8.     In *Polk v. Gibson*, 257 So. 2d 225 (Miss. 1972), this Court upheld the dismissal of a lessor's bill of complaint against a lessee.   Gibson, the lessee, leased a building from a predecessor to Polk to operate a discount store.  *Id.* at 226.   The terms of the lease agreement provided for $1,500 per month in base rent and bonus rent in the amount of one and one-half percent (1 1/2%) of annual gross sales in excess of $1.2 million dollars.  *Id.* at 228.   Polk filed suit against Gibson alleging a breach of the lease agreement.  *Id.* at 226.   More specifically, Polk sued Gibson for loss of bonus rent when Gibson moved its discount store to another location and used the leased premises as a warehouse until Gibson entered into a sublease[5] with another party, Southern Fabrics, Inc., whose annual sales were not sufficient to provide bonus rent to Polk.  *Id.* at 227-31.

¶9.     In *Polk*, this Court found that Gibson was only responsible for paying the base rent following its move to another location because there was no language in the lease agreement specifically requiring Gibson to remain in Polk's building and conduct its business there:

> This Court takes knowledge of the fact that there is nothing in this language which specifically requires the lessees to remain on said premises in said building and to conduct therein a discount business.   The substance of the requirements of the lessees is that they must pay the guaranteed minimum rental

---

[5] Both the lease agreement between Polk and Gibson and the sublease agreement between Gibson and Southern Fabrics, Inc., which transferred all of Gibson's rights and obligations to Southern Fabrics, Inc., contained identical rental terms. *Polk*, 257 So. 2d at 230.

6

of $18,000 per year in monthly installments of $1500 each for the use and occupancy of said premises and that said monthly minimum rentals of $1500 must be paid in advance.

*Id.* at 228. This Court held that there was no manifest error in the lower court's finding:

that neither the Southern Fabrics, Inc., . . . [Sublessee], nor Gibson Products Company . . . and John D. Thomas, as [Sublessors], have become liable for bonus rentals under the original lease, dated March 1, 1963, between J. O. Barron, Jr., Lessor, and Gibson Products Company . . . and John D. Thomas, Lessees, for the reason that the gross annual sales on said leased premises have not exceeded $1,200,000 per annum so as to invoke the percentage or bonus rentals provided in said original lease.

*Id.* at 231-32.

¶10. The case sub judice is strikingly similar to *Polk* in that the Lease Agreement contains no term requiring Rogers-Usry to maintain any of its new vehicle operations on the Facilities property.

¶11. Reading the lease agreement as a whole, the language of the lease is clear and unambiguous. Pertinent provisions of the lease agreement between the parties are as follows:

LEASE AGREEMENT

Lease agreement, by and between FACILITIES, INC., . . . as Lessor . . . and ROGERS-DINGUS CHEVROLET, INC., . . . as Lessee . . . .

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants herein contained and the conveyance of the leasehold interest contemplated herein and the payment of the considerations hereinafter enumerated, the Lessor and Lessee agree as follows:

1. Lessors hereby ***let, lease and demise*** unto Lessee the following ***described real property*** *located at 1561 Highway 80 West, Brandon, Mississippi* . . . all suitable for the ***operation of a retail automobile dealership*** by the Lessee . . . .

2. Term. The term of this lease shall be for a period of fifteen (15) years . . . .

7

3. _**Rent**_.  _**Lessee shall pay to Lessor**_, without deduction or set-off, . . . the following for the _**use**_ and _**occupancy of the Leased property**_:

(a)    On the first day of each month during the first ten (10) years of this lease agreement the amount of $10,000.00 per month ("Basic Monthly Rental")

(b)    On the Tenth (10th) annual anniversary date of this lease agreement, the Basic Monthly Rental shall be increased by the total cumulative percentage increase in the cost of living index shown by the Nation Consumer Price Index published by the United States Bureau of Labor Statistics for the proceeding ten year period.  ("Inflationary Increase")  . . .  Such inflationary increases shall be cumulative and in no event shall the monthly rental be less than the Basic Monthly Rental plus all Inflationary Increases for all preceding years . . . .

(c)    If during any calendar month the _Lessee shall sell **more than 100 new**_ automobiles, trucks, vans and/or similar vehicles (collectively "vehicle"), the _Lessee **shall**_, _**in addition to**_ the Basic Monthly Rental and Inflationary Increases in (a) and (b) above, _pay as additional rent $100.00 per **new** vehicle_ sold during each calendar month, in excess of 100 vehicles.  ("_**Bonus Rent**_") Such Bonus Rent shall be _applicable to each calendar month_ during the fifteen (15) year term of this lease agreement.

\* \* \*

5.1 _**Use**_.  Lessee shall _**use**_ and _occupy the **Leased property only as a retail automobile dealership**_ and automobile service center and _for no other purpose_ without prior written consent of the Lessor . . . .

\* \* \*

10.1 _**Assignment and Sublease**_.  Lessee may not mortgage, pledge, or otherwise encumber its interest in the Lease or in any sublease of the Property. Lessee may not assign this Lease or sublet the Leased property to any person without the prior written consent of the Lessor.  In addition, any _**sublease**_ or assignment to which the Lessor consents _**shall expressly be subject to the provisions of this Lease**_, and provide further, that _**no such** assignment or sublease shall affect or **reduce any obligations of Lessee hereunder**_, and _**all obligations**_ of Lessee hereunder shall _**continue** in full effect_ . . . .

8

10.2 Performance. ***Any act required to be performed by Lessee pursuant to the terms of this Lease may be performed by any sublessee or assignee and the performance of such act shall be deemed to be performed by Lessee and shall be acceptable as Lessee's act by Lessor***.

(Emphases added).

¶12. The heading of Section 3(c) of the lease agreement, which contains the Bonus Rent provision, is entitled "Rent." "Rent" is defined as: "Consideration paid, usu. periodically, for the use or occupation of property (esp. real property)." Black's Law Dictionary 1322 (8th ed. 2004). The rent was to be paid not only for the "occupancy" of the demised lease property, but also for the "use" of same. It is evident that Rogers-Usry intended to occupy the real property described in Section 1 of the Lease Agreement "for the operation of a *retail* automobile dealership by Lessee." (Emphasis added). Indeed, Section 5.1 of the Lease Agreement required the demised property to be used and occupied only as a *retail* automobile dealership and automobile service center and for no other purpose.

¶13. The term "retail" includes both *new* and *used* cars which are sold to a consumer or end-user and not a wholesaler or reseller of vehicles. *See* Black's Law Dictionary 1341 (8th ed. 2004) (defining "retail" as "[t]he sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing"); Webster's New Collegiate Dictionary 996 (10th ed. 2001) (defining "retail" as "the sale of commodities or goods in small quantities to ultimate consumers").

¶14. In Section 3(c), the parties specifically used the term "new," rather than the term "retail," which the parties used in Section 5.1. As previously stated, *supra*, this Court is required to look to the language the parties used in expressing their agreement, ***Pursue Energy***

9

*Corp.*, 558 So. 2d at 352 (citing *Pfisterer*, 320 So. 2d at 384), and when construing a contract/lease, we are required to read the contract as a whole, so as to give effect to all of its clauses, *Brown*, 606 So. 2d at 126 (citing *Newell v. Hinton*, 556 So. 2d 1037, 1042 (Miss. 1990); *Glanz Contracting Co. v. Gen. Elec. Co.*, 379 So. 2d 912, 917 (Miss. 1980)).

¶15.    The choice to employ the word "use" in Section 5.1[6] dispels any dubiety as to whether the lease is ambiguous.    "Use" is defined as: "**3. a.** The permission, privilege, or benefit of using something . . . **8.** *Law*. **a.** The enjoyment of property, as by occupying it or exercising it." Webster's II New Collegiate Dictionary 1215 (2001) (emphases in original).    We are not at liberty to infer intent contrary to the words employed because the words employed are the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.    *See Simmons*, 593 So. 2d at 42-43 (citing *Cooper*, 587 So. 2d at 241).    Unquestionably, the rent is payment for the "use" of that particular piece of property located at 1561 Highway 80 West in Brandon, Mississippi, and not for the "use" of other property in Brandon, or anywhere else for that matter, to sell new or used vehicles.

¶16.    As the learned chancellor astutely observed: "Nothing in Section 5.1 requires Rogers-Usry to use the premises to sell 'new' automobiles, only 'retail' automobiles."    Had the parties intended for the property to be exclusively used and occupied only for the sale of "new" vehicles, they could have employed language so stating, rather than entering into an agreement stating that the Facilities property was only to be used and occupied as a "retail" automobile

---

[6] As stated in the Lease Agreement and previously stated in this opinion: "Lessee shall ***use and occupy*** the ***Leased property*** ***only as a retail automobile dealership*** and automobile service center and for no other purpose. . . ."  (Emphases added).

dealership. However, notwithstanding that in Section 3(c) the parties agreed that Bonus Rent would be paid for each "new" vehicle sale in excess of 100 per month, in Section 5.1 the parties chose not to employ the word "new," but rather employ "retail." We agree with the chancellor in that, "[w]hether the RRU[7] property is 300 or 3000 feet from the Facilities, Inc. property is immaterial. The Lease and rent are unequivocally tied to the Facilities, Inc. property."

¶17. Under Section 5.1, Facilities granted Rogers-Usry *limited* permission to "use and occupy" the leased premises as a "retail" dealership and service center. There is no claim that Rogers-Usry has failed to fulfill its obligation to "use and occupy" the Facilities property as a "retail" automobile dealership and service center. Therefore, Rogers-Usry was fully compliant with the requirements of Section 5.1, and thus, had not breached the Lease Agreement.

¶18. Had Facilities intended to collect Bonus Rent from sales at other physical locations, it could have employed language in the Lease Agreement providing for same. However, since Facilities did not include a clear and unambiguous provision requiring same in the Lease Agreement, it cannot fairly argue now that such was its intent.

¶19. Section 3(c) is silent as to whether or not the Lessor or Lessee intended that Bonus Rent would apply to new vehicle sales only at the Facilities property, or would apply, *in futuro*, to new vehicle sales at another undefined property; no matter the location or number of locations or for sales at locations neither owned nor controlled at the time the agreement was

---

[7] RRU, LLC is a Mississippi limited liability company that owns the separate new property and building leased to Rogers-Usry. The owners of RRU are John Rogers, Sandra Rogers and Joe Usry.

11

entered. It is the _silence, not the language of the lease_, that has created this dispute. However, silence alone does not necessarily create an ambiguity as a matter of law. *See Ivison v. Ivison*, 762 So. 2d 329, 336-37 (Miss. 2000) (where this Court, in a domestic case, stated: "The silence of a divorce agreement with respect to whether support payments are taxable does not render that agreement ambiguous and open to interpretation.").

¶20. This concept is neither new nor novel and has been adopted by a number of states.[8] *See Lyon Dev. Co. v. Bus. Men's Assurance Co. of Am.*, 76 F.3d 1118, 1124 (10th Cir. 1996) ("Silence on a subject does not create an ambiguity within a contract."); *N. Crossarm Co., Inc. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d 752, 759 (W.D. Wis. 2004) ("[S]ilence does not necessarily mean that a contract provision is ambiguous"); *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993) (In a contract, "[s]ilence does not by itself necessarily create ambiguity as a matter of law."); *Wash. Univ. v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 465 (Mo. Ct. App. 1990) (citing *Mobil Oil Credit Corp. v. DST Realty Inc.*, 689 S.W.2d 658, 660 (Mo. Ct. App. 1985)) (stating that the fact that a contact or lease is silent on a particular point does not make it ambiguous); *Nissho Iwai Europe PLC v. Korea First Bank*, 99 N.Y.2d 115, 121-22, 782 N.E.2d 55, 60, 752 N.Y.S.2d 259, 264 (2002) (quoting *Trs. of Freeholders & Commonalty of Town of Southampton v. Jessup*, 173 N.Y. 84, 90 (1903)) ("[A]mbiguity does not arise from silence, but from 'what was written so blindly and imperfectly that its meaning is doubtful.'"); *Statler Arms, Inc. v. APCOA, Inc.*, 92 Ohio Misc. 2d 45, 54, 700 N.E.2d 415, 421 (1997) ("The fact that a contact or lease is silent

---

[8] Although not controlling in this State, the law from other states is instructive.

on a particular point does not make it ambiguous."); ***Lidawi v. Progressive County Mut. Ins. Co.***, 112 S.W.3d 725, 731 (Tex. App. 2003) (internal citations omitted) ("Ambiguity in contract language, however, is not to be confused with silence. Ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning. In contrast, when a contract is silent, the question is not one of interpreting the language but rather one of determining its effect."); ***Embrey v. Royal Indem. Co.***, 986 S.W.2d 729, 731 n. 2 (Tex. App. 1999) ("Ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning, not when a contract is silent on a matter.").

¶21.    Well respected treatises and legal encyclopedias address the issue no differently. *See* 11 Richard A. Lord, Williston on Contracts § 30.4, at 47-51 (4th ed. 1999) (footnote omitted) ("The contract's silence on a particular issue does not, by itself, create an ambiguity as a matter of law . . . ."); 17A Am. Jur. 2d *Contracts* § 331 (2004) (footnote omitted) ("Ambiguity in a written agreement does not arise from silence, but from what was written so blindly and imperfectly that its meaning is doubtful."); 17B C.J.S. *Contracts* § 786 (2002) (footnote omitted) ("A contract which is silent as to a point is not ambiguous in that regard; the question presented by such silence is determination of the effect of the contract rather than interpreting its language, and the trier of fact may not make such a determination). However, from this silence, we are left with only one reasonable interpretation of this critical issue.

¶22.    Consistent with a "four corners" analysis, let us not overlook the importance of Section 10.1 regarding "assignment and sublease." Assuming arguendo a third party (hypothetical Sublessee) entered into a sublease with Rogers-Usry (Lessee and hypothetical Sublessor) to use and occupy the premises to retail new vehicles. The hypothetical Sublessee

13

would be required[9] to pay Bonus Rent to Facilities (the Lessor) for each new vehicle sale in excess of 100 per month that occurred on the subleased property, and concurrently release Rogers-Usry from any obligation associated with same. In other words, had Rogers-Usry entered into a sublease and conferred all of its rights and obligations to the hypothetical Sublessee, and then moved to a new location to sell new cars, would Rogers-Usry not also be required to pay Bonus Rent to Facilities under the argument that Facilities now makes? To be sure, to require both Rogers-Usry and the hypothetical Sublessee to pay Bonus Rent to Facilities is inconsistent with reason, logic or common sense. Of greater import, such a result would be inconsistent with a fair and accurate interpretation of the contract before us.

## II. Discretionary "Canons" of Contract Construction.

¶23.     Since the Lease Agreement is not ambiguous, we do not reach Facilities' argument concerning the discretionary "canons" of contract construction.

## III. Extrinsic or Parol Evidence.

¶24.     Since the Lease Agreement is not ambiguous or subject to more than one reasonable interpretation, we do not reach Facilities' alternative argument considering extrinsic or parol evidence.

¶25.     However, as mentioned *supra*, footnotes 2 & 4, although the Court of Appeals held that the Lease Agreement was _not_ ambiguous, it is clear from the recitation of facts and procedural history and its analysis, that the foundation of its opinion is based on the consideration of evidence outside the "four corners" of the Lease Agreement. Only when an appellate court is

---

[9] As stated in the Lease Agreement and previously stated in this opinion, "any sublease or assignment to which the Lessor consents ***shall expressly be subject to the provisions of this Lease***. . . ." (Emphasis added).

14

unable to determine the parties' intent should extrinsic or parol evidence be reviewed. *Pursue Energy Corp.*, 558 So. 2d at 353. Because the Court of Appeals found the Lease Agreement to be unambiguous, it was error for the Court of Appeals to view or consider evidence outside the "four corners" of the contract.

## CONCLUSION

¶26. Confining our review to the "four corners," the Lease Agreement is not ambiguous. Accordingly, there is no justification in proceeding beyond the "four corners" of the document to interpret the intent of parties in this case.

¶27. Since the Lease Agreement is not ambiguous, and therefore not subject to more than one reasonable interpretation, the judgment of the Rankin County Chancery Court is affirmed and reinstated, and the judgment of the Court of Appeals is reversed.

¶28. **THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED AND REINSTATED, AND THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.**

**WALLER AND COBB, P.JJ., EASLEY AND CARLSON, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND IN RESULT. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. SMITH, C.J. AND DIAZ, J., NOT PARTICIPATING.**